# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2010

No. 08-41063

Lyle W. Cayce
Clerk

United States of America

Plaintiff-Appellee

v.

Kevin Andrew Pack II

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, DAVIS, and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant, Kevin Andrew Pack II (Pack), was charged with possession with intent to distribute 17.91 pounds of marihuana in violation of 21 U.S.C. § 841(a)(1) and using, possessing, and carrying a Luger pistol during, in relation to, and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Pack filed a motion to suppress the marihuana and the pistol, arguing that this evidence was tainted by an unconstitutional detention of his person that occurred during the traffic stop and subsequent search of the vehicle in which he had been a passenger. The district court denied his motion to suppress, finding that he lacked standing to challenge the evidence. Pack

No. 08-41063

entered a conditional guilty plea in which he pleaded guilty to the charge of possessing the pistol in violation of section 924(c)(1), but reserved the right to appeal the denial of his motion to suppress. Under the terms of his plea agreement, the charge of possession with intent to distribute marihuana was dismissed.

On appeal, Pack argues that he has standing to challenge the discovery of the drugs and the gun, because he has standing to contest the seizure of his person. He further argues that his motion to suppress should have been granted, because the challenged evidence was the fruit of an illegal detention that violated his Fourth Amendment rights. The Government concedes that he had standing to challenge the evidence, but argues that the undisputed factual record supports the denial of his motion to suppress.

For the following reasons, we affirm.

**FACTS AND PROCEEDINGS BELOW**

On February 26, 2006, Trooper Brian Worley (Worley) of the Texas Department of Public Safety (DPS) – a some seventeen year law enforcement officer – stopped an easterly bound vehicle bearing Indiana license plates in Hopkins County, Texas, for traveling at seventy-eight miles per hour on a portion of Interstate 30 (I-30) with a speed limit of seventy miles per hour. The driver and owner of the vehicle was Courtney Williamson (Williamson). Pack was her only passenger. The stop occurred at 8:45 a.m.[1]

Worley approached the passenger side of the vehicle and asked both occupants for their driver's licenses. He also requested the vehicle's registration.

---

[1] The timing of this and several other relevant events in this case is reflected in the time stamps on a video of the traffic stop that was admitted into evidence at the hearing on Pack's motion to suppress. They are not disputed.

No. 08-41063

He noticed that Pack appeared to be extremely nervous.  Pack was breathing heavily, his hands were shaking, and his carotid artery was visibly pulsing. Worley asked Williamson to accompany him back to the patrol car.

Once they were in the patrol car, Worley informed Williamson that she had been speeding and that he planned to issue her a warning.  He then asked her about her travel history.  She replied that she and Pack, her boyfriend, had been visiting her aunt in Houston for the last two days, because her aunt was ill.

At 8:48 a.m., Worley radioed dispatch and requested computer checks on Williamson's and Pack's licenses and criminal histories.  Dispatch informed Worley that the Texas Crime Information Center's (TCIC) computer was down, so he would only be able to obtain driver's license information at that time.  One minute later, dispatch informed him that Williamson's license was clear, but that Pack's had been suspended.

Leaving Williamson with the patrol car, Worley returned to Williamson's vehicle and informed Pack that his license had been suspended.  Pack said that he knew about the suspension. Worley then asked Pack about the couple's travel history.  Pack told Worley that he and Williamson were coming from Dallas, where they had visited friends.  Pack also said that, before going to Dallas, he and Williamson had stayed with some of his relatives in San Antonio for a few days.  In response to questioning by Worley, Pack said that he was not aware of any family Williamson might have had in Texas.  He also said that he did not know if Williamson had any family members in Texas who were ill.

Worley later testified that he knew I-30 served as a drug trafficking corridor and that Houston and Dallas were major drug distribution centers. Worley had been in law enforcement for seventeen years.  The conflicting stories

3

No. 08-41063

told by Pack and Williamson, the fact that they were traveling along a drug trafficking corridor, and Pack's extreme nervousness led Worley to believe, based on his experience, that Pack and Williamson were involved in criminal drug activity.

At 8:51 a.m., Worley returned to the patrol car, confronted Williamson with the differences between her story and Pack's, and asked her if she had any illegal items in her vehicle. She said that she did not, but she refused to grant Worley permission to search the vehicle. Worley responded by calling in a canine unit. Afterwards, he continued to question Williamson, who changed her story, claiming that Pack had stayed in San Antonio while she visited her aunt in Houston. However, she could not name any of Pack's relatives in San Antonio, and she did not know her aunt's current last name, though she claimed it previously had been "Pierson."[2]

Several minutes later, dispatch informed Worley that the DPS canine unit would take forty-five minutes to arrive. Worley cancelled the request and instead called in the canine unit of Hopkins County (where the stop occurred). He then returned to Williamson's vehicle and questioned Pack, who changed his story, denying that he had stayed in San Antonio and adding that he had visited someone in Houston with Williamson, though he said he did not know if the person they had visited was her aunt.

At 8:57 a.m., Worley told Pack to join Williamson in the back of the patrol car. In response to questioning about his criminal history, Pack admitted that he had been arrested in the past for theft and for fighting at school. Further

---

[2] Williamson may have said "Peterson" instead of "Pierson," but her response to this question on the videotape of the stop is not clearly audible.

4

No. 08-41063

questioning of the couple revealed that Williamson did not know her aunt's telephone number or home address.

At 9:02 a.m., dispatch informed Worley that the TCIC system was working again. Both records initially came back clean, but at 9:05 a.m., dispatch reported that Pack had four prior arrests for theft. At 9:09 a.m., Worley called in the license plate number of Williams's vehicle, and at 9:10 a.m. dispatch confirmed that it was registered to Williams. The canine unit arrived at 9:18 a.m., and the dog alerted to the vehicle's trunk. Worley searched the trunk and found two duffel bags containing 17.91 pounds of marijuana and a Luger pistol.

The magistrate judge's report and recommendation, and modified report and recommendation, each summarize the above stated undisputed facts in the "background" section of those respective reports.

On November 8, 2006, a grand jury indicted Pack on two counts, possession with intent to distribute 17.91 pounds of marihuana in violation of 21 U.S.C. § 841(a)(1) and using, possessing, and carrying the Luger during, in relation to, and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Pack filed a motion to suppress the marijuana and the pistol on February 19, 2008, arguing that both were the fruit of an unconstitutional seizure of his person.

A hearing on the motion to suppress was held before a magistrate judge on February 27, 2008. The only evidence presented at the hearing was the testimony of Worley and the video of the traffic stop. The magistrate judge issued a report recommending that the motion be denied on March 5, 2008. This report was withdrawn in response to objections made by Pack, and a modified

No. 08-41063

report dated April 10, 2008 was issued recommending again that the motion be denied (all without any further evidentiary hearing or request for same). The magistrate judge reached this recommendation based on its conclusion that Pack lacked standing to challenge the discovery of the evidence found in the search of Williamson's vehicle. He further held that, even if Pack had standing to challenge the discovery of the evidence, Pack had not demonstrated a factual nexus between his detention and the discovery of the challenged evidence. Pack filed additional objections, but the district court accepted the modified report and recommendation on May 2, 2008, and denied Pack's motion to suppress.

On June 3, 2008, Pack entered a conditional guilty plea in which he reserved the right to appeal the district court's denial of his motion to suppress. On September 15, 2008, he was sentenced to sixty months of imprisonment, three years of supervised release, and a $100.00 special assessment. Pack now prosecutes his appeal.

## DISCUSSION

Pack argues that the district court erred in adopting the magistrate court's modified report and recommendation, which found that Pack's motion to suppress should be denied because he lacked standing to challenge the search of Williamson's vehicle and because there was no factual nexus between his allegedly unconstitutional detention and the discovery of the challenged evidence. The Government, although it argued lack of standing below, concedes in this court that Pack had standing to challenge the evidence, asserting that Pack's standing to challenge the seizure of his person allowed him to challenge all evidentiary fruits of his seizure. However, the Government argues that we should affirm the denial of Pack's motion to suppress because the factual record

6

No. 08-41063

establishes that Pack's detention was constitutional.[3]

## I.    Standard of Review

Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law *de novo*. *United States v. Charles*, 469 F.3d 402, 405 (5th Cir. 2006). We view the evidence in the light most favorable to the party that prevailed below. *United States v. Cantu*, 230 F.3d 148, 150 (5th Cir. 2000). We may affirm the district court's decision on any basis established by the record. *Charles*, 469 F.3d at 405; *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999).

## II.    Fourth Amendment "Standing"

The exclusionary rule allows a defendant to suppress the evidentiary fruits of a violation of his Fourth Amendment rights. 6 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.1, at 4 (4th ed. 2004). Fourth Amendment rights are personal rights, which may be enforced only by the person whose rights were infringed. *Rakas v. Illinois*, 99 S.Ct. 421, 428 (1978). Because Fourth Amendment rights are personal, the Supreme Court has stated that there is no useful analytical purpose to be served by considering a matter of standing distinct from the merits of a defendant's Fourth Amendment claim. *See id.* ("Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of 'standing,' will produce no additional situations in which evidence must be excluded."). Despite this

---

[3]The historic facts concerning the stop and subsequent search of Williamson's car are largely set out in the "Factual Background" section of the magistrate judge's April 10, 2008 modified report and recommendation. At oral argument Pack's counsel expressly conceded that he was not challenging the facts as so set out. Nor has he challenged any of the hereinabove recited historic facts in any of his appellate briefing or at oral argument. The underlying facts as hereinabove set out are undisputed.

No. 08-41063

admonishment, for brevity's sake, courts often refer to the question of whether or not a defendant is asserting a violation of his own Fourth Amendment rights as one of "standing." *See, e.g.*, *United States v. Grant*, 349 F.3d 192, 195–96 (5th Cir. 2003); *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001).

In *Rakas*, the Supreme Court held that the Fourth Amendment rights of passengers were not violated when the police unlawfully searched the vehicle in which they were riding if the passengers had no ownership interest or reasonable expectation of privacy in the vehicle. *Id.*, 99 S.Ct. at 429–33. Because the passengers had no ownership interest or reasonable expectation of privacy in the vehicle, the only Fourth Amendment rights that had been violated were those of the vehicle's owner. *See id.* However, in *Brendlin v. California*, the Court held that a passenger with no ownership interest in a vehicle could challenge evidence discovered as a result of an allegedly illegal traffic stop of the vehicle, because the stop and the detention that followed constituted a seizure of the persons of everyone in the vehicle. 127 S.Ct. 2400, 2403–07 (2007). Since everyone in the vehicle was seized, the passenger's challenge was directed against a purported violation of his own Fourth Amendment rights. *See id.*

Pack argued before the magistrate judge that he had "standing" to challenge the evidence, because it was the fruit of a seizure of his person, which he had "standing" to challenge under the rule of *Brendlin*. The magistrate judge disagreed, because he found that Pack's argument contained a flawed premise. It was not necessarily true that the evidence was the fruit of Pack's seizure, because Williamson was also detained by Worley. Even if Worley had released Pack, the evidence still would have been discovered if Worley had continued to detain Williamson and her vehicle. And Pack could not assert Williamson's

No. 08-41063

Fourth Amendment rights, because Fourth Amendment rights are personal in nature. *See Rakas*, 99 S.Ct. at 428. *Cf. United States v. Sharpe*, 105 S.Ct. 1568, 1574 (1985) ("It is not necessary for us to decide whether the length of Sharpe's detention was unreasonable, because that detention bears no causal relation to Agent Cooke's discovery  of the marihuana.  The marihuana was in Savage's pickup, not in Sharpe's Pontiac; the contraband introduced at respondents' trial cannot logically be considered the 'fruit' of Sharpe's detention.").

Furthermore, the magistrate judge concluded that, even if the evidence had been obtained in part as a result of the seizure of Pack's person, he had not shown that it was obtained as a result of the only aspect of his seizure which was even arguably illegal.  A defendant cannot suppress evidence obtained as the result of a search or seizure which was legal.  *See Sharpe*, 105 S.Ct. at 1573 ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." (emphasis in original)).  Rather, he must move to suppress evidence obtained as the result of an alleged violation of his Fourth Amendment rights.  *See id.*

Pack did not allege that Worley's decision to stop Williamson's vehicle was a violation of his Fourth Amendment rights.  He could not have made this argument successfully, because the evidence was undisputed that the vehicle was speeding.  *See, e.g.*, *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) ("Appellants do not argue, nor could they, that the initial stop of their vehicle for speeding was improper.  This is so whether or not *Terry* applies.").  Pack cannot validly allege that the detention that followed the stop immediately violated his Fourth Amendment rights. Any such argument is plainly untenable under our case law.  *See, e.g.*, *United States v. Brigham*, 382 F.3d 500, 507–508

9

No. 08-41063

(5th Cir. 2004) (en banc) (describing the types of inquiries and routine checks a police officer may perform automatically upon making a lawful traffic stop). This leaves Pack's claim that his detention became illegal after Worley completed the driver's license and criminal history checks. *See generally Brigham*, 382 F.3d at 510 (discussing prior cases in which evidence was suppressed because police officers completed their "computerized driver's license and vehicle registration checks but continued to detain the drivers without reasonable suspicion . . . .").

However, Worley observed Pack's extreme nervousness and obtained Pack's conflicting story *before* the routine checks were completed. The nervousness and the conflicting story were the key facts that caused Worley to become suspicious and detain the vehicle. Therefore, the magistrate judge found that the portion of Pack's detention which Pack argued was illegal had not contributed to Worley's discovery of the drugs. If Worley had released Pack promptly after he had exhibited extreme nervousness and he and Williamson had told their conflicting stories, Worley still would have discovered the marihuana and the pistol, so long as he had continued to detain Williamson. Therefore, in the magistrate judge's words, there was no "factual nexus" between the alleged Fourth Amendment violation consisting of the subsequent continued detention of Pack and the discovery of the marihuana and the pistol. Accordingly, the magistrate judge held that Pack lacked "standing" to challenge the evidence. The magistrate judge refused to reach the issue of whether or not Pack's detention had been constitutional on the merits, because he had concluded that Pack lacked "standing."

We decline to review the issue of "standing" on appeal, because we agree

No. 08-41063

with the Government that, even if Pack had "standing" to challenge the evidence, the undisputed factual record supports the denial of his motion to suppress on the ground that his detention was constitutionally justified. In declining to address the issue of "standing," we make no comment on the propriety of the Government's decision to concede.[4]  Therefore, we assume for the sake of argument that Pack was entitled to challenge the evidence discovered in Williamson's vehicle as being the fruit of a violation of his Fourth Amendment rights.

## III. Fourth Amendment Merits[5]

---

[4]We also note that our decision to resolve Pack's case on the merits without addressing the "standing" issue is not an exercise of "hypothetical jurisdiction" like that prohibited by the Supreme Court in *Steel Co. v. Citizens for a Better Environment*. 118 S.Ct. 1003, 1016–17 (1998). This follows from the fact that the question of Fourth Amendment "standing" is not truly a question of standing in the first place, but is instead an issue of the merits of Pack's claim. *See Rakas*, 99 S.Ct. at 428 (stating that there is no useful analytical purpose to be served by considering a matter of standing distinct from the merits of a defendant's Fourth Amendment claim).

[5]Contrary to the suggestion of the dissent, nothing in *United States v. Arvizu*, 122 S.Ct. 744 (2002), requires a remand, nor does the dissent cite any case requiring such a remand on the basis of *Arvizu*. It is clear that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 116 S.Ct. 1657, 1663 (1996). "This court may affirm the district court's ruling on a motion to suppress based on any rational supported by the record." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). *See also United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999) (same). "To the extent the underlying facts are undisputed, as they essentially are here, we may resolve questions such as probable cause and reasonable suspicion as questions of law." *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994). *See also Ibarra-Sanchez* at 758 (same); *United States v. Kye Soo Lee*, 962 F.2d 430, 435 n.17 (5th Cir. 1992) (where determinative facts are not disputed, probable cause is a question of law); *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987) (reasonableness in investigatory stop cases ultimately a question of law). Here *the only* evidence before the magistrate judge was the testimony of Worley and the videotape of the stop (with audio). At no time did Pack testify (he was clearly protected by *United States v. Simmons*, 88 S.Ct. 967, 975-76 (1968)). Nor did Williamson testify. All the evidence at the hearing was presented by the United States in support of its previously filed opposition to the motion to suppress which alleged not only a lack of standing but also that, in any

No. 08-41063

We analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in *Terry v. Ohio*, 88 S.Ct. 1868 (1968). *Brigham*, 382 F.3d at 506. Under this standard, we make a two-part inquiry. *Id.* First, we examine whether or not the officer's decision to stop the vehicle was justified at its inception. *Id.* Second, we determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Id.* An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime. *Id.* at 507. If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. *See id.*

We have held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of his investigation of the circumstances that originally caused the stop. *Id.* at 508. He may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because we consider these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop. *See id.* at

event, Worley's "continued detention of Pack after the computer checks were returned was permissible" because "he had developed a reasonable suspicion that the defendant was engaged in criminal activity," citing, *inter alia*, Pack's extreme nervousness, the highway being a known drug corridor, and the above noted illogical and conflicting stories that Pack and Williamson told Worley about their travels.

Pack has at no time – here or below – challenged the *facts* as related by Worley (and recited in the magistrate judge's reports) regarding the stop as hereinabove set out.

No. 08-41063

506–08. Additionally, we have held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. *Shabazz*, 993 F.2d at 436–37. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. *Id.* at 436. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. *See id.* at 436–37.

The first part of the two-part *Terry* inquiry is not at issue in Pack's case, because it is undisputed that Williamson's vehicle was speeding, so it is undisputed that Worley's stop was justified at its inception. *See, e.g.*, *Shabazz*, 993 F.2d at 435 (5th Cir. 1993) ("Appellants do not argue, nor could they, that the initial stop of their vehicle for speeding was improper."). The Government argues that the second part of the *Terry* inquiry was also satisfied. It argues that the facts that emerged during Worley's investigation of Williamson's speeding offense were sufficient to create reasonable suspicion in his mind that Pack was engaged criminal activity, justifying Worley's decision to detain Pack until the canine unit arrived. Pack argues that Worley's decision to detain him beyond the time it took to investigate Williamson's speeding offense[6] violated the

---

[6] It is not clear exactly when Pack alleges his detention became illegal. His brief is equivocal on this point, and at oral argument, his counsel suggested that it might have become illegal after the license checks were completed at 8:49 a.m., after the criminal history checks were completed at 9:05 a.m., or after the vehicle's registration was confirmed at 9:10 a.m. Because Pack did not clearly present arguments in favor of one time over any of the others, we will presume he asserts that his detention became illegal at 9:10 a.m., after the last of Worley's computer checks was completed. *See Sanders v. Unum Life Ins. Co. of Am.*, 553 F.3d 922, 926 (5th Cir. 2008) ("'A party waives an issue if he fails to adequately brief it' on appeal." (quoting *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008)). *Cf. Brigham*, 382 F.3d at 508 (holding that an officer may run computer

second part of the *Terry* inquiry, because Pack contends that the facts that emerged during Worley's investigation could not have created reasonable suspicion that Pack was engaged in drug trafficking.

## A.  Questioning a Passenger Who Has Committed No Violation

In his brief, Pack argues that "It is unclear whether a state trooper who makes a traffic stop has the authority to require any and all passengers in that car to identify themselves and then run a computer check on passengers."  He also asserts that it is unclear "whether an officer can question a passenger who has committed no violation."

Pack's primary support for these arguments is Judge DeMoss's concurring opinion in *Grant*.  349 F.3d at 199 (DeMoss, J., concurring) ("I note particularly that [the defendant] did not raise as an issue on appeal, and my colleagues did not decide, whether a state trooper who makes a traffic stop has the authority to require any and all passengers in that car to identify themselves and then run a computer check on those passengers . . . .").  While this uncertainty arguably may have existed at the time Judge DeMoss wrote his special concurrence in *Grant*, the Government contends that it has since been dispelled by our more recent en banc opinion in *United States v. Brigham*, in which we stated that, "within the legitimate scope of the stop were the registration and license checks that [the police officer] . . . initiated on the vehicle and its occupants." *Brigham*, 382 F.3d at 509.  We agree with the Government that this language settled the issue of whether or not it was permissible to ask a passenger like Pack to identify himself and to run computer checks on his driver's license and

checks as part of his investigation of the circumstances that originally caused him to stop a vehicle).

No. 08-41063

background.

Nor is there any merit to Pack's suggestion that it may have been improper for Worley to question him in order to verify the information that had been provided by Williamson. In *Brigham*, we stated that "An officer may . . . ask about the purpose and itinerary of a driver's trip during [a] traffic stop." *Id.* at 508. We also stated that "the Fourth Amendment permits '[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'" *Id.* (quoting *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)) (brackets in original).

Therefore, we find that Pack's arguments concerning the propriety of Worley's questioning and computer checks were foreclosed by our en banc opinion in *Brigham*.

## B. Reasonable Suspicion

The central issue in this appeal is whether or not Worley had reasonable suspicion that Pack was engaged in criminal activity before Worley's routine computer checks were completed. The Government argues that reasonable suspicion was created by (1) Pack's extreme nervousness, (2) Pack's conflicting story, and (3) the fact that Pack was traveling along a drug trafficking corridor.

Pack does not address whether or not there was reasonable suspicion in any detail in his brief. Instead, his brief focuses mostly on the timing of his detention. However, he does argue in his brief that our opinion in *United States v. Jones*, 234 F.3d 234 (5th Cir. 2001), indicated that inconsistent stories were insufficient to create reasonable suspicion. He also discusses in detail our opinion in *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), arguing that the decision is "instructive" in resolving his case. At oral argument, Pack contended that our opinion in *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2003),

No. 08-41063

stands for the proposition that inconsistent stories cannot create reasonable suspicion by themselves and that our opinion in *Dortch* established that a combination of extreme nervousness and inconsistent stories is insufficient to create reasonable suspicion of drug trafficking. Before we examine these arguments in depth, it is helpful to review the general principles we use in determining whether or not "reasonable suspicion" exists.

### 1. General Principles of Reasonable Suspicion

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). Reviewing courts making reasonable suspicion determinations "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 122 S.Ct. 744, 750 (2002) (internal quotation marks omitted). In evaluating whether or not an officer's suspicion is reasonable, "due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 88 S.Ct. at 1883. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 122 S.Ct. at 751 (internal citations and quotation marks omitted).[7]

---

[7] Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that evidence bearing on that offense will be found in the place to be searched. *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2639 (2009).

No. 08-41063

## 2.    Reasonable Suspicion in *Dortch*

Pack contends that our opinion in *Dortch* established that extreme nervousness and inconsistent stories are not enough to create reasonable suspicion of drug trafficking.  This argument implies that a police officer's reasonable suspicion must be directed toward a particular crime.  While we agree that *Dortch* essentially stands for what Pack argues it does, we think that the portions of *Dortch* on which Pack would have us rely were abrogated by our en banc opinion in *Brigham*.  Therefore, we decline to use *Dortch* to analyze Pack's case.

In *Dortch*, the defendant was stopped by the police for tailgating the vehicle in front of him.  199 F.3d at 195.  The police determined that the defendant's vehicle was rented and that the rental papers did not list either the defendant or his passenger as an authorized driver.  *Id*.  The defendant and the passenger gave conflicting answers about their relationship to the person the rental agreement named as being the authorized driver.  *Id*. at 196.  Although the defendant claimed to have spent the last two days in Houston, the rental papers revealed to the police that the car had been rented the day before the stop in Pensacola, Florida.  *Id*.  The police also noted that the defendant seemed nervous.  *Id*. at 199.  Based on these observations, the police called a canine unit to the scene and, in waiting for it to arrive, detained the defendant beyond the

---

"The probable cause requirement does 'not demand any showing that such a belief is correct or more likely true than false.'" *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985) (quoting *Texas v. Brown*, 103 S.Ct. 1535, 1543 (1983)).  *See also, e.g., Haggerty v. Texas Southern University*, 391 F.3d 653, 656 (5th Cir. 2004) (probable cause "requires more than a bare suspicion but less than a preponderance of evidence"); *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001) (same); *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) (probable cause "is something more than bare suspicion, but need not reach the fifty percent mark.").

No. 08-41063

time needed to investigate the initial traffic offense. *See id.* at 196. When the canine unit arrived, the police found drugs on the defendant's person. *Id.* at 196. The defendant moved to suppress this evidence on Fourth Amendment grounds, and the district court denied his motion.

On review, a panel of this court reversed, with one judge dissenting. *Id.* at 203. The panel held that detaining the defendant beyond the time needed to run routine checks to investigate the initial traffic infraction was a violation of his constitutional rights, because there had been no reasonable suspicion that he was trafficking in drugs. *Id.* at 199. The panel held that the suspicious facts the police had observed "gave rise only to a reasonable suspicion that the car might have been stolen," not that the defendant was trafficking in drugs. *Id.* In other words, the panel in *Dortch* held (1) that in order to detain a suspect pending the arrival of a canine unit, the police had to have reasonable suspicion that the suspect was engaged in drug trafficking, and (2) that nervousness, inconsistent stories, and a rental car that was being driven without its authorized driver did not add up to reasonable suspicion of drug trafficking.

It is hard to reconcile our en banc opinion in *Brigham* with the panel's holding in *Dortch*. *See Brigham*, 382 F.3d at 517 (DeMoss, J., dissenting); Charles F. Baird & Holly L. Black, *Criminal Procedure—Fourth Amendment*, 37 Tex. Tech. L. Rev. 729, 747 (2005) ("Judge Jones confessed in her dissent to the panel opinion [in *Brigham*] that she believed *Dortch*, *Jones*, and *Santiago* were wrongly decided and should be overruled. As the author for the en banc's majority opinion, she essentially accomplished her desired result."). The factual situation in *Brigham* was very similar to *Dortch*'s. In *Brigham*, the defendant was stopped for tailgating a vehicle. 382 F.3d at 504. The defendant's vehicle was a rental car that he was not authorized to drive, and the authorized driver

18

No. 08-41063

was not one of the passengers. *Id.* The defendant appeared to be extremely nervous, and the police received inconsistent stories when they questioned the occupants of the vehicle. *Id.* at 504–05. The police did not run their routine computer checks until after the occupants had been questioned at some length. *See id.* The checks revealed that one of the passengers had given the police a fake identification card and a false name. *Id.* at 505. Due to the length of the questioning that took place before the routine computer checks were run, the total detention exceeded the time needed to investigate the initial traffic infraction. *See id.* A search of the vehicle produced illegal narcotics. *Id.* The defendant moved to suppress the evidence on Fourth Amendment grounds, and the district court denied the motion. *Id.* On appeal, a panel of this court reversed, holding that the defendant's Fourth Amendment rights had been violated, because the police had detained him beyond the time needed to investigate the traffic infraction by questioning him at length about matters not directly related to the traffic infraction before running their routine computer checks. *Id.* at 505–06.

We reviewed the panel decision en banc and affirmed the district court. *Id.* at 512. Our en banc opinion characterized *Dortch* as having established only that the police could not detain the occupants of a vehicle beyond the time needed to investigate the initial traffic violation unless there was reasonable suspicion of additional criminal activity. *See id.* at 509–10. We then held that the Fourth Amendment did not require the police to initiate their routine checks before asking basic questions of the occupants of a vehicle. *Id.* at 508, 511. We also noted that the passengers' conflicting answers to these basic questions, which caused the questioning to become so lengthy, had been beyond the investigating officer's control. *Id.* at 510. As Judge DeMoss noted in his

No. 08-41063

dissenting opinion, we did not expressly address *Dortch*'s requirement that the police have reasonable suspicion of a specific crime in order to justify a detention. *See id*. at 517 (DeMoss, J., dissenting) ("[T]he detention's scope must be strictly tied to the particularized suspicion justifying the detention in the first place. *Dortch*, 199 F.3d at 199. The majority openly disregards these requirements and simply concludes that [the police] had reasonable suspicion—but never says of what."). Instead, we found that the actions taken by the police "were reasonable under the circumstances and the detention as a whole was reasonable. . . . '[t]he absence of the authorized driver, the inconsistent explanation as to the trip to Houston, and {the passenger's} presentation of a fictitious I.D., taken together, justified {the police officers'} continued detention of the defendants.'" *Brigham*, 382 F.3d at 509 (material in brackets original; material in braces added). The en banc majority did not contest the dissent's assertion that it had ignored *Dortch*'s requirement of "particularized suspicion" of a specific crime. *See id*. at 507–12.

In *Dortch*, similar facts[8] had not been sufficient to establish reasonable suspicion that justified detaining the defendant. Instead, the *Dortch* panel had held that its facts suggested only that the vehicle had been stolen, not that the defendant was trafficking in drugs. *See Dortch*, 199 F.3d at 199. Therefore, the *Dortch* majority had reasoned, the defendant should have been released after the routine computer checks revealed that the vehicle had not been stolen. *Id*. In *Brigham*, however, we held that similar facts allowed the police to investigate

---

[8] The only notable difference between the facts articulated as the bases for the officers' suspicions in *Dortch* and *Brigham* was the use of a fake driver's license in *Brigham*. This cannot account for the difference in the outcomes of the two cases, because the use of a fake driver's license could not have provided any additional "particularized suspicion" of drug trafficking under the logic of *Dortch*.

No. 08-41063

not only the stolen car theory, but also the possibility that the occupants were carrying contraband. *See Brigham*, 382 F.3d at 509 & n.8. It did not matter that there was no direct evidence that suggested the occupants were carrying contraband. *See id.* The facts suggested that something *illegal* was afoot, so the police were entitled, as long they acted with reasonable diligence, to pursue several plausible theories in attempting to resolve the suspicion that reasonably had been created by the absence of the authorized driver, the inconsistent stories, the nervousness, and the presentation of a fake identification card. *See id.* As Judge DeMoss noted in his dissent, the majority reached its finding of reasonable suspicion in *Brigham* by discarding *Dortch*'s requirement of "particularized suspicion" *of a specific crime. See Brigham*, 382 F.3d at 517 (DeMoss, J., dissenting). Therefore, we hold that *Brigham* should be read as having abrogated *Dortch*'s requirement of "particularized suspicion" of a specific crime, in the sense of something like or generally equivalent to direct evidence of a particular, specific offense.[9]

Authority from other circuits supports the finding of reasonable suspicion in the absence of something like or generally equivalent to direct evidence of a specific particular crime. In *United States v. Vasquez*, the Tenth Circuit held that "objectively reasonable, articulable suspicion of *some* illegal activity beyond the traffic violation" existed (emphasis added), warranted the detention of a vehicle's driver pending the arrival of a canine unit, where the driver had a

---

[9] While the *Dortch* majority never used the phrase "direct evidence" in its opinion, we think this is the key difference between its reasoning and the reasoning of our en banc majority in *Brigham*. If the police in *Dortch* had noticed drug paraphernalia on the floorboard of the vehicle or smelled the odor of narcotics when the driver rolled down his window, the *Dortch* majority likely would have found that there was reasonable suspicion of drug trafficking, just as it found that there was reasonable suspicion of car theft based on the fact that the authorized driver of the vehicle was not present.

21

traffic citation in his name from another state which reflected his driver's license number but did not have his driver's license itself, the vehicle's registration was not in his name, and he stumbled over questions about his alleged girlfriend. 555 F.3d 923, 929 (10th Cir.), *cert. denied*, 130 S.Ct. 263 (2009). In *United States v. Ehrmann*, the Eighth Circuit held that there was "'a reasonably articulable suspicion for believing' criminal activity [was] afoot" that justified detaining the occupants of a vehicle pending the arrival of a canine unit where the passenger did not look up from his computer when the officer approached the car, the driver claimed to be driving from Dallas to Phoenix with no purpose other than "to hang out," the driver was vacationing during a time he claimed to be unemployed, the driver initially consented to a search but then reneged on the ground that the police needed to ask his passenger for permission to search, the passenger was squirming and trembling with nervousness, and the passenger's eyebrow twitched when he was asked if he was transporting drugs. 421 F.3d 774, 780–81 (8th Cir. 2005) (quoting *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998)).

We also note that *Brigham*'s approach seems to be more consistent with the Supreme Court's opinions than *Dortch*'s above referenced "particularized suspicion" of a specific crime requirement was. While the Court clearly requires the police to be able to articulate a "particularized . . . basis" for suspecting wrongdoing, it has often spoken of the wrongdoing itself in general terms. *Arvizu*, 122 S.Ct. at 750. In *Brown v. Texas*, 99 S.Ct. 2637 (1979), the Court stated that it "required . . . officers to have a reasonable suspicion, based on objective facts, that the individual [detained for questioning] is involved in criminal activity." *Id*. at 2641. The Court faulted the police in *Brown* for stating that the situation in an alley "looked suspicious" but being "unable to point to

No. 08-41063

any facts supporting that conclusion." *Id.* This suggests that the Court would have upheld the detention in *Brown* if the police had been able to articulate specific facts that supported their belief that there was *something illegal* afoot in the alley, even if they could not link those facts to a particular specific crime. Another example is found in *United States v. Arvizu*, where the Court stated that "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot . . . ." 122 S.Ct. at 750 (internal quotation marks omitted). Requiring police to have particularized facts that support a finding that "criminal activity may be afoot" is different from requiring the police to articulate particularized facts that support a finding that a particular specific crime is afoot. We think the latter approach, as in *Dortch*'s, referenced "particularized suspicion" requirement, goes beyond reasonable suspicion by in substance virtually requiring direct evidence or the substantial equivalent thereof and imposes a requirement that is too close to probable cause. *Cf. United States v. Sokolow*, 109 S.Ct. 1581, 1585 (1989) ("We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." (quoting *Illinois v. Gates*, 103 S.Ct. 2317, 2332 (1983)) (internal citations omitted)).

We note that some of our panel opinions after *Brigham* contain language, essentially *dicta*, seemingly endorsing the *Dortch* version of "particularized suspicion" in situations where there was *not* established reasonable suspicion of *any* sort of criminal conduct which further on the spot investigation might clear up. *See United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006) (". . . the government does not present adequate evidence of a nexus between Jenson's allegedly suspicious behavior and any specific criminal activity."); *United States*

No. 08-41063

*v. Cavitt*, 550 F.3d 430, 438 (5th Cir. 2008) ("[T]he Government must establish some nexus between a specific criminal activity and [the defendant's] questionable license and ambitious itinerary.").[10] We do not view that dicta in these opinions as binding precedent to the extent that their language might be read to require that police have "particularized suspicion" based on essentially direct evidence of a particular specific crime in order to form the "reasonable suspicion" needed to justify a detention. We conclude that *Brigham* is to the contrary on that matter.

However, our holding that *Brigham* abrogated *Dortch*'s "particularized suspicion" requirement does not allow police officers to detain an individual indefinitely, fishing for evidence of every conceivable crime that might explain the suspicious facts they articulate as having created their reasonable suspicion. This limitation follows from the fact that *both* the length of the detention and the scope of the investigation to be conducted which may justify the detention remain subject to a "reasonableness" requirement under *Brigham* and Supreme Court precedent. *See Ohio v. Robinette*, 117 S.Ct. 417, 421 (1996) ("We have long held that the 'touchstone of the Fourth Amendment is reasonableness.'" (quoting *Florida v. Jimeno*, 111 S.Ct. 1801, 1803 (1991))); *Brigham*, 382 F.3d at 507 ("The correct analysis requires district courts to consider the facts and circumstances of each case . . . to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances."). *See also*

---

[10] In contrast, *United States v. Fishel*, 467 F.3d 855 (5th Cir. 2006), is an example of a panel opinion from this court written after *Brigham* that applied the *Brigham* analysis. In *Fishel*, we found that extreme nervousness, an inconsistent story, and an expired driver's license created reasonable suspicion sufficient to detain the defendant pending the arrival of a canine unit, despite the lack of any more direct evidence that he was trafficking in drugs. *Fishel*, 467 F.3d at 856–57.

No. 08-41063

*Sharpe*, 105 S.Ct. at 1575 ("[W]e consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."); *Brigham*, 382 F.3d at 506 ("Courts . . . inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.").

Therefore, while we interpret *Brigham*'s abrogation of *Dortch*'s interpretation of the "particularized suspicion" requirement as indicating that the police do not have to observe the equivalent of direct evidence of a particular specific crime in order to detain a lawfully stopped individual to investigate where there is reasonable suspicion of criminal activity on his part, we also hold that *Brigham* requires both the scope and length of the officer's investigation to be reasonable in light of the facts articulated as having created the reasonable suspicion of criminal activity. In order for the scope of an officer's detention for investigation to be reasonable in light of the facts having created the reasonable suspicion, each crime he investigates should, if established, be reasonably likely to explain those facts.[11]

---

[11] Thus, under the facts of *Brigham*, it would have been unreasonable to detain the defendant there to question him about, for example, possible criminal violations of the Whaling Convention Act of 1949, 16 U.S.C.A. § 916 (2000) (Whaling Convention). This would have exceeded the reasonable scope of the police officer's investigation, even though he had reasonable suspicion that criminal activity was afoot, because a criminal violation of the Whaling Convention is one of the last crimes that a reasonable person would expect to be a likely cause of the suspicious behavior in *Brigham*. That such an inquiry would also violate *Dortch*'s version of the "particularized suspicion" requirement does not validate the "particularized suspicion" approach, because *Brigham*'s reasonableness requirement is a broader standard than *Dortch*'s "particularized suspicion" requirement. While every violation of *Brigham*'s reasonableness requirement would also violate *Dortch*'s "particularized suspicion" requirement, not every violation of *Dortch*'s "particularized suspicion" requirement would violate *Brigham*'s reasonableness requirement.

No. 08-41063

To summarize, we interpret our en banc opinion in *Brigham* as having returned this court's approach to analyzing purported violations of the Fourth Amendment to the *status quo ante Dortch*. After *Brigham*, we do not find that a detention during a valid traffic stop violates the detainees' Fourth Amendment rights where it exceeds the amount of time needed to investigate the traffic infraction that initially caused the stop, so long as (1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the entire detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity.

### 3.  The Sufficiency of Inconsistent Statements

Pack argues that our opinions in *Jones* and *Santiago* established that inconsistent stories are insufficient to create reasonable suspicion. Our opinions in *United States v. Estrada* and *United States v. Gonzalez* contain *dicta* that support this argument. *Estrada*, 459 F.3d at 631; *Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). Nevertheless, we find that this argument is without merit, (1) because Pack's inconsistent story is not the only factor that Worley cited as having caused him to suspect that Pack was engaged in criminal activity, (2) because we believe that these cases rely on the portion of *Dortch* that we have held was abrogated by our en banc opinion in *Brigham*, and (3) because the inconsistent stories of Pack and Williamson here are properly distinguished from the minor or irrelevant inconsistencies found in the cases Pack would have us follow.

26

No. 08-41063

The Supreme Court requires lower courts to look at "the totality of the circumstances" in evaluating whether or not the police had reasonable suspicion of criminal activity. *Arvizu*, 122 S.Ct. at 750. The Court has interpreted this requirement as prohibiting the method of "divide-and-conquer analysis," under which a court examines and rejects individually each of a number of factors that the police cite as having created reasonable suspicion, instead of examining the factors jointly. *See id.* at 751. Thus, it is improper for a court to refuse to find that reasonable suspicion existed because each of a set of circumstances has an innocent explanation. *See id.* The proper question is whether or not the entire set of circumstances, taken together, created reasonable suspicion of criminal activity. *See id.*

The Government does not allege that the only circumstance that created reasonable suspicion in Worley's mind was Pack's inconsistent story. It alleges that Pack's *extreme*, physically manifested, nervousness, his and Williamson's conflicting stories, and the fact that he and Williamson were traveling along a drug trafficking corridor combined to form reasonable suspicion in Worley's mind.

Moreover, in *Jones* and *Santiago*, panels of this court found that there was no reasonable suspicion of drug trafficking after applying *Dortch*'s version of the "particularized suspicion" approach, comparing the facts of their cases against the facts of *Dortch*, and concluding that the facts in *Dortch* had been more suspicious. *See Jones*, 234 F.3d at 241 ("In *Dortch*, we found no reasonable suspicion of drug trafficking . . . . Compared to the facts in *Dortch*, [the police officer's] bases for reasonable suspicion in this case are even less suggestive of reasonable suspicion and are at best trivial."); *Santiago*, 310 F.3d at 342 (citing *Dortch* for the proposition that "conflicting stories from the driver and passenger

about from where they traveled and the fact that neither were [*sic*] listed as authorized drivers on the rental agreement and the driver's nervousness did not give rise to reasonable suspicion of drug trafficking to support a continued detention after the completion of a computer check"). Because the more suspicious facts of *Dortch* had not been enough to establish reasonable suspicion *of drug trafficking* in *Dortch*, the panels in *Jones* and *Santiago* found that the evidence was necessarily insufficient to establish reasonable suspicion *of drug trafficking* in their cases. *See Jones*, 234 F.3d at 241; *Santiago*, 310 F.3d at 342. However, as noted, that aspect of *Dortch* was abrogated by our en banc opinion in *Brigham*.

Our opinions in *Estrada* and *Gonzalez* contain *dicta* stating that "[m]ere 'uneasy feelings' [on the part of the police] and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking." *See Estrada*, 459 F.3d at 631; *Gonzalez*, 328 F.3d at 758. However, this language was derived from our holding in *Santiago*. *See Estrada*, 459 F.3d at 631 (citing *Santiago*, 310 F.3d at 338–39); *Gonzalez*, 328 F.3d at 758 (citing *Santiago*, 310 F.3d at 338–39). Therefore, it was indirectly based on *Dortch* and also fails to survive *Brigham* as a correct statement of law.

Additionally, we note that the inconsistencies in the defendants' stories in *Jones*, *Santiago*, and *Estrada* were all relatively minor, compared to the inconsistencies between Pack's and Williamson's stories.[12] In *Jones*, the driver

---

[12]The inconsistencies in *Gonzalez* were major, and they played a large role in establishing the reasonable suspicion that we found had existed in that case. *See* 328 F.3d at 757–58. Nevertheless, the *Gonzalez* panel cited *Santiago* for the proposition that it would not have been proper to find reasonable suspicion based on the inconsistent statements alone. *See id* at 758. Instead, it found that there was reasonable suspicion

No. 08-41063

of the stopped vehicle indicated that his passenger was his uncle and that they were going to Memphis for "a couple of weeks" to do some work for "Street Institute Records." 234 F.3d at 237. In response to similar questioning, the passenger indicated that the driver was his son-in-law's brother and that they were going to Memphis for "about a week" to promote an album produced by "Sage Stone Entertainment." *Id*. The driver and the passenger offered to show the police proof that Sage Stone Entertainment and Street Institute Records had collaborated on the album, but the police refused to read the album's label. *Id*. at 238. The driver also clarified later in his questioning that his passenger was really his brother's father-in-law. *Id*. Such inconsistencies were minor and reconcilable. It made sense that a person might refer to his brother's father-in-law as an uncle. It also made sense that two studios would collaborate on the same album. The discrepancy in the amount of time the two planned to be in Memphis might have resulted from a misunderstanding, from the fact that they had not set a firm schedule, or from the fact that the actual time was something like ten days.

In *Santiago*, the defendant indicated that the woman and two children in the stopped vehicle were his wife and children. 310 F.3d at 338. When he was confronted with the fact that his name was listed on the vehicle's registration along with the name of a different woman, the defendant looked extremely surprised and attempted to convince the police that the passenger was his ex-wife and that the woman on the vehicle's registration was his current wife. *Id*.

---

based on a combination of factors: "Gonzalez appeared very nervous, was hesitant in answering the most basic questions about his travel plans, lied about why he didn't have a driver's license, was 500 miles away from the road leading to his claimed destination, was on a road associated with drug trafficking, and had been arrested for drug trafficking in the past." *See id*. *Gonzalez*, like *Santiago* and *Jones*, was decided before *Brigham*.

No. 08-41063

at 339. The defendant claimed that they were going to Atlanta for a week, while the woman in the vehicle claimed that they were going to Atlanta for two or three weeks. *Id.* at 338. The vehicle had California license plates and was stopped in Louisiana. *Id.* at 337–38. While the inconsistencies in *Santiago* were more serious than those in *Jones*, they were still reasonably reconcilable. It was possible that the defendant was telling the truth about the identity of the woman in his car. It was also possible that the discrepancy in the group's travel dates was due to a mis-communication or due to the woman including the driving time from California to Atlanta in her estimate of how long the group would be "in Atlanta."

*Estrada* contains an archetypical example of a minor inconsistency. The owner of the stopped vehicle stated that he had bought the vehicle a month before the stop occurred, and the owner's brother said he thought the owner had bought it three months before the stop. *Estrada*, 459 F.3d at 629. It was entirely reasonable for someone who did not own the vehicle not to know when his brother had bought it.

The inconsistencies in *Jones*, *Santiago* and *Estrada* were simply too minor and insignificant to give rise to any reasonable suspicion of *any* criminal activity.

In contrast to the inconsistencies in *Santiago*, *Jones*, and *Estrada*, the inconsistencies between Pack's and Williamson's stories were neither reconcilable nor minor. Among other things, the two could not agree on which major city (many miles apart) they had spent the last several days visiting or whom they had visited there. As the video of the stop recorded Worley telling Williamson, their stories were "completely different." Therefore, neither *Jones*, *Santiago* nor *Estrada* can be applied properly to the situation in Pack's case.

Finally in this connection, we note that under Texas law it is a crime to,

30

with intent to deceive, knowingly make a material, false statement to an investigating officer.  Section 37.08 of the Texas Penal Code provides that:

> "(a) A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to:
>
> (1) a peace officer conducting the investigation; or
>
> (2) any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation.
>
> * * *
>
> (c) An offense under this section is a Class B misdemeanor." Tex.

Pen. Code Ann. § 37.08 (Vernon 2003).

A traffic stop is a criminal investigation, and speeding is an arrestable offense. Tex. Transp. Code Ann. § 543.001 (Vernon 1999).  *See Atwater v. City of Lago Vista*, 121 S.Ct. 1536, 1541 (2001).  Because making a material, false statement during the investigation of a traffic stop is itself a crime under Texas law, it is hard to argue that an officer would not have reasonable suspicion of criminal activity when confronted with a statement reasonably viewed as false and material to his investigation of a traffic violation.

To summarize, we decline to hold that the inconsistent stories in Pack's case do not suffice to create a reasonable suspicion of criminal activity for three reasons.  First, the Government relies on a combination of several factors to establish reasonable suspicion rather than on the inconsistent stories alone. Second, the cases that held that inconsistent stories were insufficient relied on the *Dortch* version of "particularized suspicion" and thus were abrogated by *Brigham*.  Third, we find that the inconsistencies in the cases that found no reasonable suspicion because the conflicting stories were an insufficient basis, involved essentially minor inconsistencies which were not as serious or so likely

No. 08-41063

intentionally deceptive as those found in Pack's case.

### 4.    Reasonable Suspicion in Pack's Case

It is undisputed that Worley detained Pack beyond the time needed to investigate the speeding infraction that caused Worley to stop Williamson's vehicle. Worley's final computer check was completed at 9:10 a.m., and the canine unit did not arrive until 9:18 a.m. Therefore, in order for this detention to have been legal, we must conclude that the facts Worley articulated as the basis for his suspicion that criminal activity was afoot were observed by 9:10 a.m. and were sufficient to make his suspicion of criminal activity reasonable. We must also conclude that the length of the detention and the scope of Worley's investigation were reasonable in light of the facts creating the reasonable suspicion criminal activity.

At the hearing on Pack's motion to suppress, Worley testified that, by 8:51 a.m., Pack's extreme nervousness, Pack's and Williamson's conflicting stories, and the fact that the two were traveling along a drug trafficking corridor already had caused Worley to suspect that they were engaged in criminal drug activity. Worley's suspicion is entitled to significant weight, because he had been a law enforcement officer for seventeen years. *See Arvizu*, 122 S.Ct. at 750–51 ("[O]fficers . . . draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (quoting *United States v. Cortez*, 101 S.Ct. 690, 695 (1981))). As we noted above, the fact that likely both of the vehicle's occupants were lying to Worley may have been criminal activity itself under Texas law. We also note, though it was not cited by Worley, that Pack's suspended license could have contributed to Worley's reasonable suspicion of criminal activity, since licenses are usually suspended for less than

32

law abiding conduct.  Furthermore, by 9:10 a.m., Pack had admitted to prior arrests for theft and fighting.  Based on the totality of these circumstances, we hold that it was reasonable for Worley to suspect that criminal activity warranting further investigation was afoot.

We also hold that the length of the entire detention was reasonable in light of the suspicious facts that Worley had observed.  The police must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly.  *Sharpe*, 105 S.Ct. at 1575.  In this case, Worley discovered the marihuana and the pistol within thirty-five minutes of stopping Williamson's vehicle.  He initially tried to resolve his suspicion by requesting permission to search the vehicle.  When Williamson denied him permission, he immediately called for a canine unit.  When dispatch informed Worley that it would take forty-five minutes for the DPS canine unit to arrive, he cancelled the request and called in the Hopkins County unit instead.  This shortened the detention by twenty-five minutes and resulted in a delay of only eight minutes between the completion of the last of Worley's routine checks and the arrival of the canine unit.  In view of the suspicious facts that Worley had observed, this short delay was reasonable, and it did not render the length of the entire detention unreasonable.

Finally, we hold that the scope of the investigation that Worley conducted during the detention was reasonable in light of the suspicious facts he had observed.  When the occupants of a vehicle are nervous and tell such irreconcilable stories to the police, the number of likely explanations for their conduct is limited.  Computerized license, registration, and warrant checks quickly explore the possibility that the vehicle is stolen or that its occupants are fugitives from justice.  Considering the large volume of contraband that is moved

No. 08-41063

along our major highways on a daily basis, especially in border states like Texas, a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers.   Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband.   Worley testified that Pack's extreme nervousness, the irreconcilable stories, and the location of the stop immediately caused him to suspect drug activity. Accordingly, he investigated the possibility that Pack and Williamson were smuggling drugs by requesting permission to search their vehicle and calling in a canine unit when permission was denied.   We hold that Worley's decision to investigate the possibility of drug trafficking was reasonable, because drug trafficking provided a reasonably likely explanation for the suspicious facts that he had observed.

The facts Worley observed during his investigation of Williamson's speeding offense created reasonable suspicion that additional criminal activity was afoot, and the length of the entire detention and the scope of his investigation were reasonable in light of the suspicious facts he had observed. Therefore, we hold that Pack's Fourth Amendment rights were not violated by Worley's decision to detain him beyond the brief time needed to investigate Williamson's speeding violation.

## CONCLUSION

Assuming *arguendo* that Pack asserted a relevant violation of his Fourth Amendment rights when he moved to suppress the evidence found in

34

No. 08-41063

Williamson's vehicle, we hold that the undisputed evidence addressed at the hearing on Pack's motion as a matter of law reflects that the detention to which he objected was legal.  Therefore, his Fourth Amendment rights were not violated, and the district court did not err in denying his motion to suppress.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

DENNIS, Circuit Judge, dissenting:

In denying the motion to suppress evidence, the district court committed three legal errors: (1) It erred in deciding that the defendant, Kevin Andrew Pack, II ("Pack"), lacked standing to challenge his prolonged detention by the police officer because Pack was merely a guest passenger in the vehicle; (2) Because of its error on standing, the district court also erred in failing to decide whether the officer had a reasonable articulable basis to suspect Pack of a crime that warranted further investigation and justified Pack's continued detention; and (3) The district court erred in concluding that, in any event, Pack could not move to suppress the evidence derived from his prolonged detention because he did not prove a "nexus" between his detention and the evidence. Therefore, the district court's judgment, denying the motion to suppress, should be vacated, and the case should be remanded for further determinations, including: (a) "Reasonable suspicion": a determination of whether the officer had a reasonable articulable basis to suspect Pack of a crime that justified his prolonged detention; and, if necessary, (b) "Fruit of the poisonous tree": If the officer lacked such reasonable suspicion, whether the evidence was "fruit" of the unlawful detention.

The majority errs by affirming rather than vacating the district court's judgment, and by failing to remand the case for a determination of whether there was "reasonable suspicion" for the prolonged detention and, if necessary, whether the evidence was fruit of the unlawful detention. Additionally, the majority errs by usurping the district court's functions by assessing witness credibility, finding facts, and inferring reasonable suspicion. It also errs in misinterpreting and misapplying circuit precedents, including *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (en banc),

and *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), which, if correctly followed, would require a different result even on the facts improperly found by the majority.

For these reasons, I respectfully dissent.

## I.

Each of the district court's foregoing errors of law is discussed below. They originated in the magistrate judge's Modified Report and Recommendation and were adopted without change by the district court.

## A.

First, the district court concluded that Pack did not have standing to challenge the constitutionality of the vehicle's search because he was merely a guest passenger in the vehicle in which the marijuana and pistol were later found. As Pack states in his motion to suppress, he contests not only the search of his luggage in the vehicle's trunk, but also the "stop and detention" of his person, which he argues led to the search of the vehicle and the discovery of the challenged evidence. The Supreme Court, in *Brendlin v. California*, held that "[w]hen a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment . . . [and] a passenger [therein] is seized as well and so may challenge the constitutionality of the stop." 551 U.S. 249, 251 (2007). The Court stated that this conclusion "comports with" the view that: "If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit." *Id.* at 258-59 (quoting 6 Wayne R. LaFave, *Search and Seizure* § 11.3(e), at 194-95

& n.277 (4th ed. 2004 & Supp. 2007)). Therefore, Pack had standing to object to the length of his detention as a constitutional violation and to have the evidence found in the vehicle suppressed if it was a fruit of that invalid detention.

The district court apparently read *Brendlin* as holding that a passenger only has standing to challenge the constitutionality of the traffic stop itself and lacks standing to contest the prolonged detention of his person. However, this is plainly contradicted by the above-quoted text from *Brendlin*, that a passenger may challenge "the length of the passenger's detention" following a stop. 551 U.S. at 259. Thus, under *Brendlin*, Pack has standing to contend that his prolonged detention after the stop was unlawful because it was not based on an articulable reasonable suspicion of a crime and to have suppressed any evidence that is the fruit of that unconstitutional detention. Therefore, the district court's erroneous determination of the scope of Pack's standing should have been rejected and, as its judgment stemmed from this error, its ruling should have been vacated.

B.

Second, because the district court mistakenly decided that Pack did not have standing to challenge the length of his detention after the stop, the district court erred by failing to determine whether the officer justifiably prolonged Pack's detention. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *Brigham*, 382 F.3d at 506. "This court, following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as *Terry* stops." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam); *Dortch*, 199 F.3d at 198). "Pursuant to *Terry*, the legality of police

investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). "Under the second prong of the *Terry* test, the question before the court is whether [the officer's] actions after he legitimately stopped the [vehicle] were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Id.* at 507.

Here, Pack did not challenge the initial stop of the vehicle for speeding. However, it is undisputed that Pack's detention lasted far longer than was necessary for the officer to issue the driver a warning for speeding, his only basis for the stop. Thus, because, as shown above, Pack had standing to challenge his prolonged detention as unlawful, it is essential to a correct disposition of this case for the district court to determine whether the detention was "reasonably related . . . to dispelling [the officer's] reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. *See also id.* ("[A] detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts emerges." (citing *Dortch*, 199 F.3d at 200; *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001))).

The Supreme Court has said repeatedly that to make a "reasonable suspicion" determination, a trial court must consider the "'totality of the circumstances'" to see whether the detaining officer has a "'particularized and objective basis'" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). This review enables "officers to draw on their own experience and specialized training to make inferences from and deductions about the

cumulative information available to them that 'might well elude an untrained person.'" *Id*. (quoting *Cortez*, 449 U.S. at 418).

As a result, the Supreme Court has made clear that the initial determination of "reasonable suspicion" to support an officer's actions must be made by the "resident judge[]," *viz*., the motion court of first instance, and that an appellate court reviewing the resident judge's ruling must give "'due weight'" to that court's "factual inferences." *Arvizu*, 534 U.S. at 273-74 (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). *See Murray v. United States*, 487 U.S. 533, 543 (1988) ("[I]t is the function of the District Court rather than the Court of Appeals to determine the facts . . . ."); *United States v. Cole*, 444 F.3d 688, 688 (5th Cir. 2006) ("Defendant Demetric Cole appeals the denial of his motion to suppress drugs found in his vehicle following a traffic stop. Because we are unable to resolve the legality of the stop without additional fact finding, we vacate the district court's order denying Cole's motion to suppress and remand for further proceedings."). Thus, the district court's failure to reach the "reasonable suspicion" issue *vel non* justifies vacating and remanding for further proceedings.

Yet the majority disregards *Arvizu*, *Ornelas*, and *Cole*, and makes its own *ab initio* determination of "reasonable suspicion." Accordingly, it usurps the "resident judge's" role as the initial arbiter of that primary question. The majority asserts it can do so in this case because the district court implicitly found, and the defendant conceded, facts supporting its inference of reasonable suspicion. But the record simply does not support the majority's assertion or inference. The district court did not determine "reasonable suspicion" or make any factual findings pertinent to such a determination. The magistrate judge's report adopted by the district court merely summarizes the officer's testimony without analyzing it for credibility and

reliability, or assessing how it impacted the totality of circumstances. Further, the majority's notion that Pack's attorney conceded facts that support the officer's reasonable suspicion is refuted by both the attorney's recorded oral argument and her briefs. During oral argument she stated repeatedly that no court had ever addressed the issue of reasonable suspicion. Therefore there could be no factual findings or credibility determinations that either support the Government's argument or contradict Pack's motion to suppress. Likewise, in her brief, while Pack's attorney acknowledged the testimony of the arresting officer, she never agreed that the officer's testimony was credible, reliable, or sufficient to establish "reasonable suspicion." Thus, she did not concede the factual finding that would be essential for an appellate court to adopt the allegations of the Government as true and use them to determine whether there was reasonable suspicion. Accordingly, the majority's substitution of itself for the district court in making the initial determination of "reasonable suspicion" is not supported by the law or the record.[1]

---

[1] The cases the majority cites in its footnote 5 for the proposition that this court can determine in the first instance whether there was reasonable suspicion do not actually support such a rule. In *United States v. Waldrop,* 404 F.3d 365, 367 (5th Cir. 2005), *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999), *United States v. Kye Soo Lee*, 962 F.2d 430, 434-35 & n.16 (5th Cir. 1992), and *United States v. Basey*, 816 F.2d 980, 986-87 (5th Cir. 1987), unlike in the instant case, before this court passed upon the issue the district court ruled upon the merits of the motion to suppress, making relevant factual findings. *See also United States v. Kye Soo Lee*, 898 F.2d 1034, 1039-40 (5th Cir. 1990) (another appeal of the same *Kye Soo Lee* case detailing more of the lower court's findings). *Blackwell v. Barton*, 34 F.3d 298, 301, 305 (5th Cir. 1994), was a 42 U.S.C. § 1983 action, in which our standard of review was governed by the summary judgment standard under the Federal Rules of Civil Procedure, not the rules of criminal procedure at issue in the present case. Moreover, even under the majority's logic an appellate court should only act as the initial arbiter of reasonable suspicion if the facts are undisputed. That is not true here. As shown above, the defendant has not conceded and the district court did not find that the arresting officer's recitation of the facts was credible.

C.

Third, the magistrate judge and district court erroneously concluded that, even if Pack's constitutional rights were violated by the prolongation of his detention, his motion to suppress must be denied because Pack did not prove that the evidence was a fruit of that violation. The fruit of the poisonous tree doctrine operates to exclude evidence derived from a constitutional violation unless the prosecution proves by a preponderance of evidence in the trial court that it was derived independently from that violation.

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search . . . ." *Murray*, 487 U.S. at 536 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). "Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id.* at 536-37 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). "Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *Dortch*, 199 F.3d at 200-01 (citing *United States v. Cherry*, 759 F.2d 1196, 1210-11 (5th Cir. 1985)).

The record clearly reflects that the evidence was derived from the officer's prolonged detention of Pack. The officer detained Pack, the driver, and the vehicle because he suspected Pack of transporting illegal drugs and

42

he called for a canine unit to confirm or allay his suspicion. Throughout Pack's detention the officer's only basis for suspicion of drug trafficking was *Pack's* travel on an interstate highway, *Pack's* apparent nervousness, and the inconsistency of *Pack's* itinerary story with that of the driver. Pack's prolonged detention enabled the drug dog to alert on the vehicle's trunk and the officer to discover the evidence in the baggage inside the luggage compartment. Thus, based on the current record, the evidence was derived from Pack's prolonged detention and should have been suppressed if the officer lacked reasonable suspicion to detain Pack for that protracted period.

Rewriting the record, the majority contends that the magistrate judge and district court concluded the evidence was not a fruit of Pack's prolonged detention because the officer also had reasonable suspicion to hold the driver, and thereby the car, and thus the marijuana would have been discovered regardless of whether or not Pack was released. Majority Op. 10. However, the driver's conduct was mentioned only once in the magistrate judge's analysis, in reference to her speeding, which the magistrate judge concluded and Pack conceded justified the initial stop, but not the continued detention. Instead, the magistrate judge continually returned to the claim that "Pack exhibited signs of nervousness" as the Government's justification for the officer's "suspicio[ns]." Therefore, it was clearly Pack's behavior that the Government alleged and the lower court thought was being used to justify the continued seizure of Pack, the driver and the car.

As a result, the magistrate judge and district court legally erred in concluding that the evidence could not have been suppressed, even if Pack's prolonged detention was unlawful, on the theory that Pack had to prove a nexus between his unlawful detention and the evidence. That theory is invalid. If Pack's prolonged detention was unlawful, it is evident that on the

43

present record the evidence was a fruit of that violation and therefore had to be suppressed. In such a case, the burden would be on the government, not Pack, to prove a break in the chain of events linking the violation and the evidence or that the evidence was or could have been obtained independently of the unlawful detention. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). Because the government failed to argue, and the record fails to show, that there is any basis for inferring that the evidence was or could have been obtained independently of Pack's prolonged detention, there was no valid basis for the district court to conclude that the marijuana was not a fruit of the unlawful detention.[2]

## II.

In addition to the errors discussed above, the majority opinion, in my view, also misreads and misapplies several of our circuit precedents. As the majority recognizes, we held in *Dortch*, 199 F.3d 193, that the bare fact that motorists were traveling on an interstate highway, combined with their "extreme nervousness and inconsistent stories, [is] not enough to create reasonable suspicion of drug trafficking." Majority Op. 16. Yet these are the precise and exclusive facts from which the majority finds "reasonable suspicion" in the instant case for the first time from a cold record on appeal. Tacitly conceding its inability to distinguish *Dortch* from the present case, the majority tries to circumvent it by arguing that *Dortch* was overruled by *Brigham*, 382 F.3d 500. But this argument lacks persuasive merit.

---

[2] For example, the Government did not argue or show that either Pack or the owner-driver of the vehicle consented to the officer's search of the vehicle or the luggage in its trunk; nor is there any contention that the challenged evidence is admissible under the inevitable discovery or independent source doctrines. *See Murray*, 487 U.S. at 537; *Nix*, 467 U.S. at 443; *Cherry*, 759 F.2d at 1205-06.

Rather than overruling *Dortch*, *Brigham* distinguishes and builds upon *Dortch*, as has been observed by a host of other circuit precedents citing to and applying *Dortch* following *Brigham*. *See United States v. Cavitt*, 550 F.3d 430, 436 (5th Cir. 2008) (citing as binding precedent *Dortch*'s analysis that the facts in *Dortch* do not establish reasonable suspicion); *United States v. Khanalizadeh*, 493 F.3d 479, 483 (5th Cir. 2007) (same); *United States v. Jenson*, 462 F.3d 399, 404-05 & n.5 (5th Cir. 2006) (holding that the government lacked reasonable suspicion based on the facts of that case in part because "[w]e have previously found detentions unreasonable based on the totality of the circumstances, when the driver exhibited signs of nervousness" (citing *Dortch*, 199 F.3d at 199-200)). In fact, *Brigham* positively cites *Dortch* at least eight times, *Brigham*, 382 F.3d at 506, 507, 508 & n.7, 509 & n.8, 510, 511, including in relation to *Dortch*'s analysis that its facts do not establish reasonable suspicion, *id.* at 510 (criticizing the dissent for extending *Dortch* beyond its "facts and reasoning" on which the majority relied).

Seeming to recognize that its argument is undermined by circuit precedent, the majority also argues that all of the cited cases' discussions of *Dortch* must be dicta because *Dortch* and *Brigham*'s holdings are clearly irreconcilable. However, *Dortch* and *Brigham* can easily be read together. In *Brigham*, unlike in *Dortch* and the instant case, one of the detained suspects produced a fake I.D. This provided much of the officer's basis for reasonable suspicion, justifying the prolonged detention and eventual search. *Brigham*, 382 F.3d at 505, 509 ("Once Conklin learned that Franklin's I.D. was likely false, Conklin acted reasonably, with further questioning."). By contrast, *Dortch* mirrors the facts alleged in the instant case, which the *Dortch* majority concluded did not establish reasonable suspicion. *See* 199 F.3d at 196. Therefore, *Dortch* and *Brigham* can be reconciled by the obvious truth that

No. 08-41063

concealing one's identity from a police officer by producing a forged document can tip the totality of circumstances toward reasonable suspicion, where an individual's mere inconsistencies and nervousness could not.

CONCLUSION

The district court's decision should be vacated because it legally erred in: (1) concluding that Pack lacked standing to challenge the prolonged detention of his person; (2) failing to determine whether there was a reasonable articulable basis to suspect Pack of possession of illicit drugs; and (3) concluding that the evidence, which was derived from Pack's prolonged detention, could not be the fruit of that detention. Accordingly, we should have remanded the case to the district court and directed it to determine, in light of the correct legal principles, in the first instance: (1) the credible facts surrounding Pack's seizure; (2) whether those facts established reasonable suspicion; and (3) if there was not reasonable suspicion, whether the evidence found in the luggage appearing to belong to Pack was a fruit of that unlawful seizure. Therefore, I respectfully dissent.