In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00334-CR

RICHARD BRANDON CASTILLO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Orange County, Texas
Trial Cause No. E114140

## MEMORANDUM OPINION

Appellant Richard Brandon Castillo ("Appellant" or "Castillo") appeals his conviction for driving while intoxicated, a Class B misdemeanor punishable by (1) a fine not to exceed $2,000; (2) confinement in jail for a term not to exceed 180 days; or (3) both such fine and confinement. *See* Tex. Penal Code Ann. §§ 12.22, 49.04(a). In six issues, Castillo complains that the trial court erroneously denied his motion to suppress evidence, admitted testimony based on speculation, erroneously denied his motion for mistrial, and erroneously failed to instruct the jury pursuant to article

38.23 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 38.23.

We affirm the trial court's judgment.

## BACKGROUND

Castillo was charged by information stating that "on or about October 31, 2021," [he]

> did then and there operate a motor vehicle in a public place when said RICHARD BRANDON CASTILLO was intoxicated
>
> and it is further presented in and to said Court that at the time of performing an analysis of a specimen of the defendant's blood, the analysis showed an alcohol concentration level of 0.15 or more[.]

Castillo moved to suppress all the evidence of his intoxication, contending that it was the fruit of an illegal detention. The trial court denied the motion and allowed presentation of the challenged evidence.

Guilt and punishment were tried to a jury. The jury did not find Castillo guilty of the offense charged, driving while intoxicated with a blood alcohol concentration of 0.15 or more, but did convict him of the lesser included offense of driving while intoxicated. Pursuant to the jury's punishment verdict, the trial court sentenced Castillo to sixty days in the Orange County jail and a $2,000 fine, plus a statutory traffic fine of $6,000 and court costs of $450. The trial court suspended Castillo's sentence and placed him on community supervision for two years.

2

We summarize below the relevant evidence presented during the hearing on Castillo's Motion to Suppress and at trial.

Charlene Wappler's Testimony

Charlene Wappler testified that on October 31, 2021, she was driving from a relative's home in Mont Belvieu to her own home in Bridge City. As Wappler drove, she saw two white trucks that were "driving crazy[]" and "cutting in and out cutting off people." Wappler was concerned by the trucks' unsafe operation so she watched them as they continued to vary their speed and "weave[] in and out" of traffic and "pass[] unsafely." After Wappler and the two trucks took the Winnie exit, Wappler was able to get close to them, and she saw that "the driver had his hand on the steering wheel and a gun in the other one and he shot off two rounds" out of the driver's side window toward an empty field. Seeing the gun concerned Wappler enough that she called 9-1-1 to report the incident. Wappler initially spoke with Chambers County dispatch, but as she drove, she was transferred to other departments. Wappler provided the truck's license plate and described what she saw as it happened, including the fact that the truck "lost control and he spun out into the median" as the truck took a sharp turn "at a very high rate of speed[.]" Although Wappler at one point thought that the incident was over, it was not, and the driver of the truck "gassed it, fishtailed and got out of the median and proceeded down 73

3

towards Bridge City." Wappler also saw the truck force another vehicle past the fog line, but no collision occurred.

As Wappler reached Bridge City, she saw a Bridge City police vehicle stop the truck, which pulled into a convenience store/gas station. Although Wappler also pulled into the gas station, she did not speak to law enforcement officers at that time but instead provided a statement the following day.

Sergeant Adam Granger's Testimony

Bridge City Police Department Sergeant Adam Granger testified at both Castillo's suppression hearing and at trial. At trial, Granger testified that dispatch notified him of a "reckless driver" who "had been firing a firearm out of the vehicle and going at a high rate of speed." Wappler was the caller reporting the incident. Dispatch advised that the vehicle was entering the city from the Veterans Bridge area, and when Granger saw the vehicle and verified the license plate number, he stopped the vehicle.

When Castillo pulled into the gas station parking area, Granger told Castillo to "come back to my vehicle," and Castillo cooperated without stumbling or swaying. Granger asked Castillo what had happened, and Castillo did not slur his speech when he acknowledged "being stupid or not making good decisions" and admitted "to discharging the firearm out of the vehicle." After the officers retrieved the gun from Castillo's vehicle and ensured that it was not stolen, Granger continued

4

speaking with Castillo, and "started to notice there [were] some other things going on with this call that [he] didn't catch on to initially due to paying attention to the firearm." Specifically, Granger thought Castillo "was possibly intoxicated[]" because Castillo admitted consuming alcohol and smelled of alcohol, and the mud and grass on Castillo's vehicle showed that Castillo had lost control of his vehicle. In addition, Granger noted that "firing a firearm out of a vehicle, that's not something a sober reasonable person would do[.]" Granger, therefore, intended to perform a standard field sobriety test on Castillo, but Castillo declined the test, stating that he would fail the test due to equilibrium issues and a "bad knee." Granger then arrested Castillo for driving while intoxicated.

Since Castillo consented to having his blood drawn, Granger transported Castillo to the Orange County jail infirmary, where nurse Kim Pearson drew Castillo's blood for alcohol testing. Granger described the infirmary, stating that "[i]t appeared sanitary." Granger watched the nurse draw Castillo's blood, and when the nurse handed the tube to Granger, he placed the sticker on it, initialed it, and placed it back in the plastic container. After the blood tubes were placed in the box, the box was sealed and placed in the outgoing mail to a laboratory for testing.

During cross-examination, Granger acknowledged that he completed investigating the firearm incident and intended to allow Castillo to leave, but had not

5

told Castillo he was released; when Granger realized that he was dealing with a possible D.W.I. matter and proceeded accordingly.

Lieutenant Amanda Seal's Testimony

Lieutenant Amanda Seal testified that she is a registered nurse and a nursing supervisor at the Orange County Jail. As a nursing supervisor, her duties include supervising licensed vocational nurses, such as Kimberly Pearson, and overseeing jail inmates and their care. Seal described Pearson as "a wonderful nurse[.]" Seal outlined her professional education and experience, noting that she earned her nursing degree at Lamar University in Orange, and worked at the jail since September 2019. Seal testified the duties of the licensed vocational nurses include not only providing inmate care but performing blood draws for D.W.I. cases. According to Seal, although the jail infirmary is "pretty much in the center of the jail[,]" and shares air circulation with the jail, jail personnel take blood draws in a "clean environment" that is cleaned every time it is used. Seal could not, however, verify that the area was properly cleaned or that Ms. Pearson properly performed Castillo's blood draw, since Seal was not present at the time.

Kevin Moyer's Testimony

Kevin Moyer testified that he worked as a forensic scientist at the Houston DPS Crime Laboratory. Moyer described his education, training, and experience, and explained the process of analyzing blood. During the test procedure, Moyer

6

observed no signs that Castillo's blood had been contaminated, and Moyer found no problems with the procedure. According to Moyer, he followed the required protocols to test Castillo's blood, and "[t]he result in this case was 0.222 grams of alcohol per 100 milliliters of blood." To reach that blood alcohol concentration, a person would have to have consumed eleven standard drinks at the time of the blood draw.

Moyer acknowledged there had been a tube recall due to the absence of preservatives that were supposed to have been inside the tubes, and he agreed it "could cause problems" if the anticoagulant was present but the sodium fluoride was lacking. Moyer was unsure, however, whether this case was affected by the recall. Moyer also acknowledged that failing to refrigerate a blood sample could cause problems, and that if a sample were contaminated with Candida albicans, that contamination could, under the right conditions, cause the blood sample to produce alcohol and would yield an inaccurate test result.

Moyer testified that he has received training regarding the effects of alcohol. That training teaches that at a 0.222 blood alcohol level, a person "could be staggering[,]" and "could be slurring their words." In Moyer's experience, however, alcohol overuse does not always cause such behavior.

<u>Jennifer Sisco's Testimony</u>

Castillo called Jennifer Sisco as an expert witness. Sisco described the proper procedure for drawing blood to avoid contamination. Specifically, Sisco testified that following proper procedure requires washing one's hands and putting on gloves. The technician drawing the blood would then palpate the area to find a vein and would apply the tourniquet and cleanse the area with an alcohol-free cleanser to avoid contaminating the blood sample. The area is then cleaned and dried before drawing the blood. Once the needles are inserted into the tubes and the subject's arm, blood will automatically flow into the tube and will stop when the tube is full. Since the tubes were "only three-fourths and two-thirds of the way full[,]" Sisco assumed that the seals were not proper.

The tubes should be stored at temperatures between seventy and seventy-five degrees, since heat can affect the preservative and the seal. After collecting the subject's blood, the tube must be slowly inverted eight to ten times to mix the preservatives in the tube and then refrigerated "to preserve the integrity of the specimen" and "to keep contamination growth down." Sisco was concerned about the maintenance history of the laboratory equipment used to test Castillo's blood, since the manufacturer had not maintained it since 2018.

Sisco viewed videos of the jail infirmary where Castillo's blood was drawn, and testified one video showed blood on the walls and garbage on the floor. Sisco

therefore did not consider the infirmary environment sanitary. Sisco did not believe that Castillo's test result was valid because the blood was not refrigerated and because it cannot be determined that Granger and the nurse followed proper blood draw procedures.

Digital Evidence

The State played for the jury the recordings of Wappler's 9-1-1 call and Granger's body camera. Although Granger's dash camera recording was admitted without objection, the trial court admitted the recording of Wappler's call over Defendant's objection that the exhibit did not include Wappler's entire call. The State played the body camera recording at the hearing on Castillo's Motion to Suppress, also.

Castillo's Motion to Suppress

Castillo moved to suppress his arrest and the results of his blood alcohol test on the grounds that law enforcement officers extended the traffic stop beyond the valid reason for initially stopping him. Under Castillo's argument, the officers at the scene of the traffic stop concluded their investigation about the firearm, but then unreasonably prolonged the stop, in violation of the Fourth Amendment, to assess Castillo's possible intoxication. Therefore, according to Castillo, everything occurring after the officers determined that Castillo had not committed a firearms

9

violation was fruit of the poisonous tree and should be suppressed as a Fourth Amendment violation.

The State argued that Granger was initially focusing on the gun, and that it was not until the officers were about to allow Castillo to leave, but had not yet done so, that Granger appreciated the evidence of Castillo's possible intoxication.

The trial court viewed the issue thus: did the officers "unlawfully prolong the detention? Did Officer Granger lack reasonable suspicion to question Mr. Castillo about D.W.I. once the initial reason for the traffic stop had ended?" After reciting the evidence of alcohol use and erratic driving, the court explained, "[n]ow, it seems to me that it's intertwined, because all during the questioning about the weapon, there's questioning about 'Have you been drinking? I smell alcohol.'" The court then found "that the officer did have reasonable suspicion to ask just a little bit more and do a little more investigation once it was decided that they weren't going to detain Mr. Castillo for firing the firearm or having the firearm." The Court accordingly denied Castillo's motion to suppress.

Castillo's Motion for Mistrial

During the stop, Castillo admitted to having been arrested for possession of drug paraphernalia nearly ten years previously. Later, Granger asked Castillo "as far as being in trouble before, it was just for the marijuana, right[?]" The State agreed to edit that admission from Granger's body camera video before playing the video

10

for the jury. Due to a technical issue, the State inadvertently played the inadmissible portion, and Castillo moved for a mistrial.

Although the trial court denied the motion for mistrial, it instructed the jury to disregard Granger's comment, stating:

> Ladies and Gentlemen, we just heard an officer make a statement along the lines of "as far as being in trouble, it was just for the marijuana." You're instructed to disregard that statement by the officer and not to consider that statement in any way, shape, or form, especially's [sic] when it comes to determining the guilt or innocence of Mr. Castillo for this offense of driving while intoxicated.

Castillo's Requested Jury Instruction

Castillo requested the trial court to instruct the jury not to consider illegally obtained evidence. *See id*. art. 38.23. The instructions Castillo sought read:

**REQUESTED INSTRUCTIONS NO.1**

**I. 38.23 Illegally Obtained Evidence**

> You are instructed that under our law no evidence obtained or derived by an officer or other person as a result of an unlawful stop or detention shall be admissible in evidence against such accused. An officer is permitted to make a temporary investigative detention of a motorist if the officers have specific articulable facts, which taken together with rational inferences from those facts, lead them to conclude that a person detained actually is, has been, or soon will be engaged in criminal activity. Now, bear in mind that if you find from the evidence that on the occasion in question, the defendant, Richard Brandon Castillo, had been released from the initial detention by the officers for the purpose of the stop, or have reasonable doubt thereof as to the legality of the extension of the stop, then such detainment of the accused would be illegal and, if you find the facts to be so, or if you have reasonable doubt thereof, you will disregard the testimony of the officers relative to their

11

detaining of the Defendant, and their conclusions drawn as a result thereof and you will not consider such evidence or any other evidence presented from any point in time after Defendant was stopped for any purpose whatsoever and you will find the Defendant Not Guilty.

Now, if you find that the officer showed a specific articulable fact that he did not have during his initial investigation prior to releasing the Defendant from the initial stop, then you may consider such evidence and give it whatever weight you decide and will continue to the next question.

**REQUESTED INSTRUCTIONS NO. 2**

I.      **38.23 Illegally Obtained Evidence**

You are instructed that in order for you to consider any testimony or evidence regarding the blood evidence presented, you must first determine beyond a reasonable doubt that the Statute of the State of Texas Code of Criminal Procedure, section 38.23 has been complied with. This Statute states that:

"No evidence obtained by an officer of other person in violation of any provisions of the Constitution of laws of the State of Texas, or of the Constitution of the laws of the United States of America, shall be admitted into evidence against the accused on the trial of any criminal case."

If you believe, or have a reasonable doubt, that the evidence was obtained in violation of the provisions of this statute or any other under the Code of Criminal Procedure, based on testimony presented, you shall disregard any such evidence so obtained and f[i]nd the Defendant Not Guilty.

II.     **Blood Test Results**

You are instructed, that in order to consider the blood test results, you must first determine beyond a reasonable doubt that the blood sample was not contaminated.

If you believe, or have a reasonable doubt thereof, as to the accuracy of the blood specimen results in this case due to contamination, you may not consider those results for any purpose whatsoever.

Now, if you find, by the testimony presented that blood specimen results were not contaminated and believe such results are accurate, you may consider those results.

### III.     **Chain of Custody (Blood)**

You are instructed that in order for you to consider the Blood Test results, you must first determine that the State proved beyond a reasonable doubt that:

1.) A proper chain of custody exists for the blood sample,

AND;

2.) That the blood tested was the same blood drawn from the Defendant.

If you have reasonable doubt as to whether or not the State met proved both elements above, then in this event, you shall disregard any such, evidence so obtained and find the defendant Not Guilty.

Now, if you find, beyond a reasonable doubt that the State has met both elements, you may consider such evidence and give to it whatever weight you decide.[1]

The trial court denied Castillo's request, stating "[w]hen I think of defenses, I just think of Chapter 8 defenses."

---

[1]Castillo sought additional jury instructions that are not pertinent to this appeal.

13

## STANDARD OF REVIEW AND ANALYSIS

Issues One and Two: The Scope and Duration of the Traffic Stop

In his first two issues, Castillo contends that the evidence of his intoxication resulted from a Fourth Amendment violation. *See* U.S. CONST. amends. IV, XIV; *see also* Tex. Const. art. I, § 9.[2] More specifically, Castillo argues that although the law enforcement officers properly stopped him to investigate a report of reckless driving and gunshots, the officers unreasonably prolonged his detention when they began investigating his possible D.W.I. offense. Therefore, Castillo argues, the officers violated his Constitutional rights, rendering all evidence of his intoxication illegally obtained and consequently inadmissible. Castillo argues the trial court erred in denying his motion to suppress such evidence and further erred in admitting evidence obtained through the alleged violation.

We apply a bifurcated standard to a trial court's ruling on a motion to suppress. *See State v. Pettit*, 713 S.W.3d 834, 839 (Tex. Crim. App. 2025). This standard "gives almost total deference to the trial court's determination of historical facts that the record supports and considers de novo the application of the law to the facts." *Id*. We review a trial court's ruling on the admission of evidence under an

---

[2]Although Castillo asserts violations of both the Fourth Amendment and Article I, Section 9, he does not argue Article I, Section 9 affords broader protections, so we analyze this case under the Fourth Amendment. *See Limon v. State*, 340 S.W.3d 753, 757 n.15 (Tex. Crim. App. 2011).

abuse-of-discretion standard. *See Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). We may not reverse the trial court's ruling on either issue unless such ruling was "arbitrary, unreasonable, or outside the zone of reasonable disagreement." *Pettit*, 713 S.W.3d at 839; *see also Inthalangsy,* 634 S.W.3d at 754.

The Fourth Amendment to the United States Constitution protects people "against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. As Castillo has correctly noted, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. U.S.*, 575 U.S. 348, 350 (2015). *Rodriguez* cautions, however, an officer may prolong a stop if he has "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 355. In fact, *United States v. Pack,* 612 F.3d 341 (5th Cir. 2010) addresses just such a situation. In *Pack*, a vehicle was stopped for speeding, but when the driver and passenger responded inconsistently to the officer's questions, the officer suspected illicit activity and requested a canine unit. *Id*. at 345–46. Although the canine unit took twenty-seven minutes to arrive, the court upheld the legality of the search, which yielded over seventeen pounds of marijuana, because the police had a reasonable suspicion of additional criminal activity before concluding the initial investigation. *Id*. at 361–62. "Reasonable suspicion" is an objective standard, and "exists if the officer has specific, articulable facts that, when combined with rational inferences from those

15

facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. Cal.*, 573 U.S. 373, 382 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Perfection, however, is not required. *See Heien v. N.C.*, 574 U.S. 54, 60–61 (2014).

Before Granger placed Castillo back in his truck, Granger knew that Castillo had consumed alcohol, not only because Granger smelled alcohol on Castillo, but because when Granger asked, Castillo admitted to drinking "three beers." Granger also knew because Castillo admitted it, that Castillo had fired gunshots from the vehicle. While looking in the cab of the truck, Granger saw the sod trapped in the door frame, and stated "looks like he went off the damn roadway." Wappler's 9-1-1 call also alerted officers that Castillo was "goin' real fast" and "went off the road" at "Dead Man's Curve." In other words, before Granger returned Castillo's driver's license to him and directed him to return to his truck, Granger knew Castillo had consumed alcohol, fired a weapon, and driven fast enough to cause his vehicle to briefly leave the roadway. Since a reasonable sober person would neither shoot a weapon from a moving vehicle nor fail to maintain control of his vehicle, Granger had a reasonable, articulable suspicion that Castillo's alcohol consumption had deprived Castillo of "the normal use of his mental or physical faculties[.]" Tex. Penal

16

Code Ann. § 49.01(2)(A). Therefore, although Granger prolonged the stop to investigate Castillo's possible intoxication, Granger did not do so unreasonably. *See Navarette v. Cal.*, 572 U.S. 393, 401–02 (2014) (holding that the totality of the circumstances supported the investigation because a reasonable police officer would have had a reasonable suspicion of drunk driving); *see also Pack*, 612 F.3d at 362 (permitting additional investigation when additional reasonable suspicion develops during the traffic stop). The totality of the information available to Granger supported a reasonable suspicion that Castillo was intoxicated, and, therefore, justified prolonging the stop to investigate that suspicion.

Although *Navarette* turned on whether information provided by a 9-1-1 caller may justify an investigative traffic stop, which is not an issue in this case, the opinion lists several types of erratic driving, including "'driving in the median,'" that are "strongly correlated with drunk driving." *Navarette v. Cal.*, 572 U.S. at 402; *see also Leming v. State*, 493 S.W.3d 552, 563–65 (Tex. Crim. App. 2016) (law enforcement possessed information that the defendant's erratic driving was consistent with intoxication, so the investigative stop did not violate the Fourth Amendment).

Castillo also posits that since Granger did not appreciate the significance of the DWI indications until after Granger decided to "cut him loose," Granger's further investigation was unconstitutional. Granger's subjective intent, however, is not relevant to the disposition of this matter. *See Furr v. State*, 499 S.W.3d 872, 878

17

(Tex. Crim. App. 2016). Instead, "we look to the totality of the circumstances, including the cumulative information known to cooperating officers at the time of the detention." *Id.* (citing *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011)). The responding officers, including Granger, possessed "specific, articulable facts that, when combined with rational inferences from those facts, would lead [officers] to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Furr,* 499 S.W.3d at 878 (citing *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013)).

Since Granger possessed information that would create a reasonable, articulable suspicion that Castillo was intoxicated, he did not violate the Fourth Amendment by taking the time needed to investigate that possibility. The trial court, therefore, correctly denied Castillo's motion to suppress the evidence thus obtained, and did not err in admitting the evidence during trial. We overrule Castillo's first and second issues.

Issue Three: Speculation

Granger testified Castillo said words to the effect, "I'm screwed no matter what[,]" during the stop. The following exchange then took place:

> [The State]: Why would someone usually use that terminology when it comes to that?
>
> [Defense Counsel]: Objection, speculation.
>
> The Court: If he knows, he knows. I'll overrule.

18

[Granger]: If someone says that, the way I take it is they're guilty of something. They know they screwed up.

[The State]: But not even let's throw the word "guilty" out of it. Just it doesn't matter what choice they go, they're in a bad spot?

[Granger]: Correct.

[The State]: And even throughout the video on the way back, they continue to say – the defendant continues to say, "I screwed up. I'm screwed"?

[Granger]: Yeah. He was, I think, concerned about his job at the time, contacting his boss.

On appeal, Castillo contends that the trial court reversibly erred by permitting Granger "to speculate as to why appellant would have remarked regarding his predicament." Citing Texas Rule of Evidence 701, the State responds that the trial court "properly overruled Appellant's objection to speculation, because Officer Granger was entitled to provide the jury his opinion and inferences based on his own personal experiences that are relevant to the case[.]"

A trial court's admission or exclusion of evidence is reviewed on appeal for abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). "The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We overturn a trial court's ruling on the admission or exclusion of evidence only when the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Taylor v. State*, 268 S.W.3d

19

571, 579 (Tex. Crim. App. 2008). If the trial court's evidentiary ruling is correct on any theory of law applicable to the case, that ruling will not be disturbed even if the trial judge gave the wrong reason for the correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Texas Rules of Evidence 602 and Rule 701 apply when a party objects that the testimony sought is speculative. *See* Tex. R. Evid. 602, 701; *Solomon v. State*, 49 S.W.3d 356, 364–65 (Tex. Crim. App. 2001); *Turro v. State*, 950 S.W.2d 390, 403 (Tex. App.—Fort Worth 1997, pet. ref'd). Rule 602 requires that a witness have personal knowledge of the matter on which he or she is testifying. Tex. R. Evid. 602. Rule 701 allows a lay witness to express an opinion when the opinion is rationally based on the witness's perception and is helpful to the jury's understanding of the witness's testimony or to the jury's determination of a fact at issue in the case. *See id*. 701; *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

The first prong of Rule 701 requires a witness to rationally base his or her testimony on what he or she perceives. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364–65; *Fairow v. State*, 943 S.W.2d 895, 897 (Tex. Crim. App. 1997). The personal knowledge of the events forming the basis of the witness's opinion may come directly from what the witness sees, hears, or smells, or otherwise from the witness's experience. *Osbourn*, 92 S.W.3d at 535; *Fairow*, 943 S.W.2d at 898. An opinion is rationally based on a witness's perception if the opinion is one a

20

reasonable person could have drawn under the circumstances. *Fairow*, 943 S.W.2d at 900. The second prong of Rule 701 requires that the witness's opinion be helpful to the trier of fact. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364–65. There is no "bright line" test indicating when an opinion is helpful. *Fairow*, 943 S.W.2d at 900. "This consideration is especially prudent when the opinion concerns culpable mental state." *Id*.

The trial court could have reasonably concluded that Granger had personal knowledge of the event upon which he based his opinion, since Granger was interacting with Castillo when Castillo made the allegedly incriminating statement. *See id*. at 898–99; *see also* Tex. R. Evid. 701. The trial court also may have reasonably concluded that a reasonable person could interpret this statement as Granger did: that Castillo knew he "screwed up[,]" especially considering that Castillo made the statement while handcuffed and sitting in the back seat of a police car. *See Fairow*, 943 S.W.2d at 900.

Because Granger's conclusion was rationally based on his perception and experience, it was not improper for him to testify how he interpreted Castillo's statement, so long as Granger's interpretation was helpful to the jury. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364; *Fairow*, 943 S.W.2d at 898-99. Testimony is helpful when it either helps the jury understand the witness's testimony or determine a fact in issue. *Fairow,* 943 S.W.2d at 900. The trial court may have

reasonably concluded Granger's opinion offered insight into Castillo's state of mind which would be helpful to the jury in determining Castillo's guilt. "A consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt." *Harris v. State*, 645 S.W.2d 447, 456 (Tex. Crim. App. 1983) (internal quotation marks omitted) (citing 2 Ray, Texas Evidence 1538 (3rd ed. 1980)). Because the trial court's ruling was within the zone of reasonable disagreement, we cannot conclude that the trial court abused its discretion in allowing this testimony, and we overrule Castillo's third issue.

Issues Four and Five: Extraneous Offense Evidence and Motion for Mistrial

Granger's body camera footage depicts Castillo admitting that he was charged with possession of drug paraphernalia about ten years previously and Granger later asking Castillo "as far as being in trouble before, it was just for the marijuana, right?" Castillo then replies "yes." The trial court directed the State to edit such statements from the exhibit before showing the body camera video to the jury and the State agreed to do so. Nevertheless, the video contained these statements when played for the jury. Although the trial court instructed the jury not to consider that portion of the video, Castillo's motion for mistrial was denied.

Evidence of Castillo's extraneous offense was inadmissible, and the State does not contend otherwise. Tex. R. Evid. 404(b); *see Valadez v. State*, 663 S.W.3d

133, 141 (Tex. Crim. App. 2022). Instead, the State responds that the trial court cured this error with its instruction to disregard, and the error, therefore, was harmless.

As with admissibility questions, we review a motion for mistrial for an abuse of discretion. *See Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016). The trial court's ruling must be upheld if it was within the zone of reasonable disagreement. *See Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (internal quotations omitted). "'It is well established that a jury instruction to disregard a statement or remark will ordinarily cure the error[.]'" *Redd v. State*, 578 S.W.2d 129, 130 (Tex. Crim. App. 1979) (quoting *Watson v. State*, 532 S.W.2d 619, 624 (Tex. Crim. App. 1976)); *see also Adams v. State*, 156 S.W.3d 152, 157 (Tex. App.—Beaumont 2005, no pet.). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins,* 135 S.W.3d at 77 (citing *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003)).

The body camera video played for the jury was fifty-two minutes long. Of those fifty-two minutes, perhaps ten seconds referenced Castillo's previous criminal charge. The remainder of the video showed Castillo interacting with Granger, and by Granger's own testimony, Castillo was not stumbling or slurring his words and

23

committed no traffic infraction in Granger's presence. As in *Adams*, these circumstances are not sufficiently extreme to render any prejudice incurable and warrant a mistrial. *See Adams,* 156 S.W.3d at 157.

In *Adams*, a D.W.I. case, a witness inadvertently mentioned information that the trial court previously ruled inadmissible. *Id.* at 157. The trial court instructed the jury to disregard the inadmissible matter but denied the defendant's motion for mistrial. *Id.* On appeal, we determined that "the State's question, and the officer's response that the reading was over .08 were not so inflammatory that they could not be cured by an instruction to disregard." *Id.* at 158. In reaching that conclusion, we followed our sister court's approach in *Roberson v. State*, 100 S.W.3d 36, 41 (Tex. App.—Waco 2002, pet. ref'd) which gauged the effectiveness of an instruction to disregard by using the following criteria: "'the nature of the [improper comment]; the persistence of the prosecutor; the flagrancy of the violation; the particular instruction given; the weight of the incriminating evidence; and the harm to the accused as measured by the severity of the sentence.'" *Id*.

Applying these criteria to the instant case, we believe that the trial court's instruction to disregard was effective to cure the error. Not only was the failure to remove the inadmissible extraneous offense information inadvertent, but also the State did not mention it either before or after playing the video for the jury. In addition, the trial court's instruction was "pointed, clear, and definitive: the trial

judge expressly stated the [] jury was not to consider [the inadmissible evidence]." *Adams*, 156 S.W.3d at 157. "Finally, given the statutory punishment for a class B D.W.I. misdemeanor, [Castillo's] sentence was not severe. [] The trial court, pursuant to statutory authority, suspended the imposition of the sentence and placed [Castillo] on community supervision." *Id.* at 158; *see* Tex. Penal Code Ann. 49.04(b); Tex. Code Crim. Proc. Ann. art. 42A.051. Given the similarities between *Adams* and this case, we conclude that we should reach the same result: that the trial court's instruction cured the error. We conclude the trial court acted within its discretion when it denied Castillo's motion for mistrial, and we overrule his fourth and fifth appellate issues.

Issue Six: Jury instructions

Castillo's final issue argues that the trial court should have instructed the jury to disregard certain evidence if it found that the challenged evidence was illegally obtained. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a). There are three predicates required for a defendant to be entitled to an article 38.23 jury instruction: "(1) the evidence heard by the jury must raise an issue of fact, (2) the evidence on that fact must be affirmatively contested, and (3) the contested factual issue must be material to the lawfulness of the challenged conduct." *See Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). Castillo, therefore, needed to affirmatively contest or raise a "disputed fact issue" warranting the instructions he sought. *Id.* at 306–07

25

(discussing what is required to establish a "disputed fact issue" in the context of being entitled to a requested article 38.23 jury instruction). In this case, as in *Hamal*, there is no factual dispute about what information Granger and his fellow officers received before and during the traffic stop. *Id*. at 307. The dispute instead hinges on the legal effect of that information, which is not properly submitted to the jury. *See Madden v. State*, 242 S.W.3d 504, 510–11 (Tex. Crim. App. 2007). Since Castillo's requested jury instructions address such matters as "the legality of the extension of the stop," "that the evidence was obtained in violation of the provisions of this statute[,]" and "[a] proper chain of custody exists for the blood sample[.]" The trial court properly refused these requested jury instructions for the reasons set forth in *Madden*: "The jury [] is not an expert on legal terms of art or the vagaries of the Fourth Amendment. It cannot be expected to decide whether the totality of certain facts do or do not constitute 'reasonable suspicion' [of intoxication] under the law." *Id*. at 511. The jury likewise cannot be expected to determine the rest of Castillo's contested legal issues, such as whether the traffic stop was unreasonably prolonged or whether the evidence was illegally obtained or improperly handled. *See id*.

Since Castillo's requested jury instructions addressed legal issues, rather than factual disputes, we overrule his sixth issue.

**CONCLUSION**

Having overruled all Castillo's issues, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on June 25, 2025
Opinion Delivered October 29, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.